LORETTA E. LYNCH
Attorney General
VANITA GUPTA
Principal Deputy Assistant Attorney General
Civil Rights Division
SAMEENA SHINA MAJEED, Acting Chief
DANIEL P. MOSTELLER, Acting Special Litigation Counsel for Fair Lending
MARTA CAMPOS, Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
    950 Pennsylvania Avenue, N.W. - NWB
    Washington, DC  20530
    Telephone: (202) 514-4713; Facsimile: (202) 514-1116
    E-mail: marta.campos@usdoj.gov

EILEEN M. DECKER
United States Attorney
DOROTHY A. SCHOUTEN
Assistant United States Attorney
Chief, Civil Division
ROBYN-MARIE LYON MONTELEONE (State Bar No. 130005)
Assistant United States Attorney
Assistant Division Chief, Civil Rights Unit Chief, Civil Division
    300 North Los Angeles Street, Suite 7516
    Los Angeles, California 90012
    Telephone: (213) 894-2458; Facsimile: (213) 894-7819
    E-mail: robby.monteleone@usdoj.gov

## UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CIVIL ACTION NO.CV 16-725 |
| Plaintiff, | |
| v. | COMPLAINT |
| TOYOTA MOTOR CREDIT CORPORATION, | |
| Defendant. | |

Plaintiff, United States of America, alleges:

1.     The United States of America brings this action against Toyota Motor Credit Corporation ("Toyota" or "Defendant") for discriminating against thousands of African-American and Asian and/or Pacific Islander borrowers across the United States who obtained loans from Toyota to finance automobiles. The discrimination is caused by Toyota's policy and practice that allows dealers to include markups in the interest rates on automobile loans in a hidden manner not based on the borrower's creditworthiness or other objective criteria related to borrower risk. The United States brings this action to enforce provisions of the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691-1691f, and its implementing regulation, Regulation B, 12 C.F.R. Part 1002.

2.     Between at least January 1, 2011 and February 2, 2016 ("the Relevant Period"), Toyota did not provide adequate constraints across its portfolio of loans to prevent discrimination. Toyota knew or had reason to know that its policy and practice of allowing dealers to mark up consumers' interest rates created a substantial risk of discrimination. Before September 10, 2014, Toyota did not monitor markup disparities.

3.     As a result of Toyota's dealer markup and compensation policy and practice and its lack of compliance monitoring, African-American and Asian and/or Pacific Islander borrowers paid higher interest rates for their automobile loans than non-Hispanic white borrowers, not based on creditworthiness or other objective criteria related to borrower risk, but because of their race and national origin. Between January 1, 2011 and December 31, 2013, the average African-American victim was obligated to pay over $200 more during the term of the loan because of discrimination, and the average Asian and/or Pacific Islander victim was obligated to pay over $100 more during the term of the loan because of discrimination.

4.     This Court has jurisdiction pursuant to 15 U.S.C. § 1391e(h) and 28 U.S.C. § 1345. Venue is proper in this District under 28 U.S.C. § 1391.

PARTIES

5.     The United States is authorized to initiate a civil action in federal district court whenever a matter is referred to the Attorney General pursuant to 15 U.S.C. § 1691e(g) and when the Attorney General has reasonable cause to believe that a pattern or practice in violation of ECOA has occurred.  15 U.S.C. § 1691e(h).

6.     Toyota is a captive auto finance company and the financing arm in the United States of Toyota Financial Services Corporation, which is a subsidiary of Toyota Motor Corporation, the world's largest car maker.  Toyota is incorporated in the state of California with its principal place of business in Torrance, California.

7.     As of the second quarter of 2015, Toyota was the largest captive auto finance company in the United States.  Toyota held a 5.2 percent share of the overall auto loan market based on originations, making it the fifth largest auto lender overall.

8.     Toyota finances or purchases both subvented and non-subvented auto loans. Subvented auto loans are loans for which an auto manufacturer, such as Toyota Motor Corporation, reduces the price of the loan through a subsidy, reduced interest rate, or other means.  Approximately 50% of Toyota's auto loans are subvented.

9.     Automobile dealers submit applications to Toyota on behalf of consumers. To determine whether it will fund a loan, and on what terms, Toyota conducts an underwriting process on each loan application submitted by its dealers on behalf of a consumer.  For those applications that Toyota approves, Toyota sets a specified "buy rate."  Toyota determines the buy rate using a proprietary underwriting and pricing model that takes into account individual borrowers' creditworthiness and other objective criteria related to borrower risk.  Toyota then communicates that buy rate to the dealer that submitted the application to Toyota.  Toyota's buy rate reflects the minimum interest rate, absent additional discounts or reductions, at which Toyota will finance or purchase a retail installment contract from a dealer.

2

10.     With respect to non-subvented retail installment contracts, Toyota maintains a specific policy and practice that provides dealers discretion to mark up a consumer's interest rate above Toyota's established risk-based buy rate.  The difference between the buy rate and the consumer's interest rate on the retail installment contract (contract rate) is known as the "dealer markup."  Toyota compensates dealers from the increased interest revenue to be derived from the dealer markup.

11.     During the Relevant Period, Toyota limited the dealer markup to 250 basis points for non-subvented contracts with terms of sixty (60) monthly payments or less; to 200 basis points for contracts with terms greater than sixty (60) and less than seventy-two (72) monthly payments; and to 175 basis points for contracts with terms of seventy-two (72) or greater monthly payments.

12.     Toyota regularly participates in the decision to extend credit by taking responsibility for underwriting, setting the terms of credit by establishing the risk-based buy rate, and communicating those terms to automobile dealers.  Toyota influences the credit decision by indicating to automobile dealers whether or not Toyota will purchase retail installment contracts on the terms specified by Toyota.

13.     Toyota's agreements with automobile dealers require that all loan applications they submit to Toyota must comply with the policies, conditions, and requirements that Toyota sets for dealers.

14.     Toyota is a creditor within the meaning of ECOA, 15 U.S.C. § 1691a(e), and Regulation B, 12 C.F.R. § 1002.2(l).

INVESTIGATION

15.     On April 25, 2013, the United States and the Consumer Financial Protection Bureau (CFPB) initiated a joint investigation under ECOA of Toyota's pricing of automobile loans or retail installment contracts.

16.     On November 25, 2014, the CFPB determined it had reason to believe that Toyota had engaged in a pattern and practice of lending discrimination on the basis of

3

race and national origin in violation of ECOA, 15 U.S.C. § 1691(a)(1).  The CFPB referred Toyota to the United States Department of Justice pursuant to ECOA, 15 U.S.C. § 1691e(g), and the December 6, 2012 Memorandum of Understanding between the United States Department of Justice and the CFPB.

17.    The United States and the CFPB analyzed Toyota's lending policies, procedures, and internal controls, including Toyota's dealer markup and compensation policy and practice.  The United States and the CFPB also performed an analysis of Toyota's loan-level data on the automobile loans Toyota funded to test for lending discrimination.

FACTUAL ALLEGATIONS

18.    The United States and the CFPB analyzed the dealer markup of the non-subvented retail installment contracts that Toyota purchased between January 1, 2011 and December 31, 2013 ("the time period covered by the analyses").  During the time period covered by the analyses, Toyota purchased hundreds of thousands of non-subvented retail installment contracts, and the United States and the CFPB determined that thousands of retail installment contracts that Toyota purchased had African-American or Asian and/or Pacific Islander borrowers.

19.    The retail installment contracts analyzed by the United States and the CFPB did not contain information on the race or national origin of borrowers.  To evaluate any differences in dealer markup, the United States and the CFPB assigned race and national origin probabilities to applicants.  The United States and the CFPB employed a proxy methodology that combines geography-based and name-based probabilities, based on public data published by the United States Census Bureau, to form a joint probability using the Bayesian Improved Surname Geocoding (BISG) method.  The joint race and national origin probabilities obtained through the BISG method were then used directly in the United States's and the CFPB's models to estimate any disparities in dealer markup on the basis of race or national origin.

4

20.     The United States's and the CFPB's markup analyses focused on the interest rate difference between each borrower's contract rate and each borrower's buy rate set by Toyota.  Toyota considers individual borrowers' creditworthiness and other objective criteria related to borrower risk in setting the buy rate as explained in Paragraph 9.  The dealer markups charged by Toyota to consumers are based on dealer discretion and are separate from, and not controlled by, the adjustments for creditworthiness and other objective criteria related to borrower risk that are already reflected in the buy rate.  Toyota's markup policy provided for dealer discretion and did not include consideration of these factors.  Because the analysis focused on only the difference between each borrower's contract rate and buy rate, it did not make additional adjustments for creditworthiness or other objective criteria related to borrower risk.

21.     During the time period covered by the analyses, on average, African-American borrowers were charged approximately twenty-seven (27) basis points more in dealer markup than similarly-situated non-Hispanic whites for non-subvented retail installment contracts.  These disparities are statistically significant, and these differences are based on race and not based on creditworthiness or other objective criteria related to borrower risk.  These disparities mean that thousands of African-American borrowers paid higher markups than the average non-Hispanic white markup and were obligated to pay, on average, over $200 more each in interest than similarly-situated non-Hispanic white borrowers assuming they held their loans for the full term of the contract.

22.     During the time period covered by the analyses, on average, Asian and/or Pacific Islander borrowers were charged approximately eighteen (18) basis points more in dealer markup than similarly-situated non-Hispanic whites for non-subvented retail installment contracts.  These disparities are statistically significant, and these differences are based on race and/or national origin and not based on creditworthiness or other objective criteria related to borrower risk.  These disparities mean that thousands of Asian and/or Pacific Islander borrowers paid higher markups than the average non-

1  Hispanic white markup and were obligated to pay, on average, over $100 more each in

2  interest than similarly-situated non-Hispanic white borrowers assuming they held their

3  loans for the full term of the contract.

4      23.    The higher markups that Toyota charged to African-American and Asian

5  and/or Pacific Islander borrowers are a result of Toyota's policy and practice of allowing

6  dealers to mark up a consumer's interest rate above Toyota's established buy rate and

7  then compensating dealers from that increased interest revenue.

8      24.    Toyota's policy and practice of allowing dealers to mark up a consumer's

9  interest rate above Toyota's established buy rate and then compensating dealers from

10  that increased interest revenue continued throughout the entire Relevant Period.

11      25.    Before September 10, 2014, Toyota did not require dealers to document

12  reasons for charging markups, did not monitor whether discrimination occurred across

13  its portfolio of loans through charging markups, and did not provide detailed fair

14  lending training to its dealers.

15      26.    Toyota's policy and practice of allowing dealers to mark up a consumer's

16  contract rate above Toyota's established buy rate and then compensating dealers from

17  that increased interest revenue without adequate controls and monitoring is not justified

18  by legitimate business need that cannot reasonably be achieved as well by means that

19  are less disparate in their impact on African-American and Asian and/or Pacific Islander

20  borrowers.  This policy and practice has been in effect during the Relevant Period.

21      27.    Toyota knew or had reason to know that its policy and practice of allowing

22  dealers to mark up consumers' interest rates created a substantial risk of discrimination.

23              <u>EQUAL CREDIT OPPORTUNITY ACT VIOLATIONS</u>

24      28.    Toyota's policies and practices as alleged herein, coupled with the

25  disparities described above, constitute discrimination against applicants with respect to

26  credit transactions on the basis of race and national origin in violation of the Equal

27

28

(2)     Enjoins the Defendant and its agents, employees, and successors, and all other persons in active concert or participation with it, from:

a)     Discriminating on the basis of race or national origin against any person with respect to any aspect of their credit transactions;

b)     Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of the Defendant's unlawful conduct to the position they would have been in but for the discriminatory conduct; and

c)     Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any such discriminatory conduct in the future; to eliminate, to the extent practicable, the effect of Toyota's unlawful practices; and to implement policies and procedures to ensure that all borrowers have an equal opportunity to seek and obtain loans on a non-discriminatory basis and with non-discriminatory terms and conditions; and

(3)  Awards equitable relief and monetary damages to all the victims of the Defendant's discriminatory policies and practices for the injuries caused by the Defendant, including direct economic costs, consequential damages, and other damages, pursuant to 15 U.S.C. § 1691e(h).

1    The United States pray for such additional relief as the interests of justice may

2 require.

3 Dated: February 2, 2016

4                                                   LORETTA E. LYNCH
                                                    Attorney General
5

6    *[signature]*                                 *[signature]*

7 EILEEN M. DECKER                                 VANITA GUPTA
   United States Attorney                          Principal Deputy Assistant Attorney General
8 Central District of California                   Civil Rights Division

9 DOROTHY A. SCHOUTEN
   Assistant United States Attorney
   Chief, Civil Division
10

11   *[signature]*                                 *[signature]*

12 ROBYN-MARIE MONTELEONE                          SAMEENA SHINA MAJEED
   Assistant United States Attorney                Acting Chief
   Assistant Division Chief                        Civil Rights Division
13 Civil Rights Unit Chief,                        Housing and Civil Enforcement Section
   Civil Division
14 Central District of California
   312 North Spring Street
15 Suite 1200
   Los Angeles, California
16 Tel.: (213) 894-2400                            *[signature]*
   Fax: (213) 894-0141
17 robby.monteleone@usdoj.gov                      DANIEL P. MOSTELLER
                                                    Acting Special Litigation Counsel
18                                                     for Fair Lending

19                                                 *[signature]*

20                                                 MARTA CAMPOS
                                                   Trial Attorney
21                                                 United States Department of Justice
                                                   Civil Rights Division
22                                                 Housing and Civil Enforcement Section
                                                   950 Pennsylvania Avenue, N.W. – NWB
23                                                 Washington, DC  20530
                                                   Tel.: (202) 514-4713
24                                                 Fax: (202) 514-1116
                                                   marta.campos@usdoj.gov
25

26

27

28                          9